SCHEB, Judge.
Appellant Kevin Wilkes challenges the trial court’s order granting custody and guardianship of his minor child, Natalie Marie Wilkes, to Marshal and Mary Crum. We agree the court erred.
Kevin Wilkes met Linda Tomanovich in Daytona Beach during March 1982, while he was serving in the United States Marine Corps. Thereafter, he continued to see her while on leave from Camp Lejuene, North Carolina. Natalie Marie Wilkes was born on June 10, 1983, the child of Linda Toma-novich and Kevin Wilkes. At the time of his daughter’s birth, Wilkes was stationed at Kaneohe Bay, Hawaii. (During her pregnancy and for the first ten months of Natalie’s life, Linda Tomanovich lived with her sister, Mary Crum, and brother-in-law, Marshall Crum, in Polk County, Florida.) After hearing of his daughter’s birth, Wilkes returned to Florida on about June 16, 1983, to be with her and Linda Tomano-vich; however, after thirty days, he was ordered to sea duty at his assigned duty station in Hawaii.
After Natalie’s birth, Tomanovich began receiving support from Wilkes, and she was able to move into her own apartment. She arranged daytime care for Natalie, and the Crums took care of her during the evenings and weekends that Tomanovich worked.
Linda Tomanovich was killed in an automobile accident on May 9, 1985. Upon learning of her death, Wilkes obtained an early release from the Marine Corps and returned to Florida to be with his daughter.
The Crums filed a petition for appointment as guardians on May 30, 1985, and Wilkes filed an answer and cross-petition for appointment as guardian on June 5, 1985. The court entered an order appointing the Crums as temporary guardians and letters of guardianship issued to them on July 1, 1985.
An evidentiary hearing was held February 27,1986, on the issue of appointment of a permanent guardian for Natalie. At the hearing the court reviewed a report by the Department of Health and Rehabilitative Services (HRS) that was submitted in evidence. The report found all parties would be suitable parents. The report, in the words of its author, was “very positive” toward Wilkes. It indicated that Wilkes was employed by B & L Appliance of St. Augustine and was planning to go into business for himself as a carpenter and handyman. It outlined that Wilkes’ mother and stepfather were willing to assist him by providing as much support as necessary to help him develop the proper child rearing and parenting skills to successfully rear his daughter. Further, Wilkes’ natural father also stated that he would assist his son in whatever manner necessary to care for Natalie.
The report revealed that all references and neighbors contacted were positive in regard to Wilkes’ character and abilities. Thus, HRS concluded that Wilkes was “a capable and competent young man who is genuinely interested in the well-being of his natural daughter.” Finally, the report noted that Wilkes had a viable plan for supervision in which his mother would be the primary caretaker and parenting role model. With her assistance, he could provide his child with a proper home environment and care.
During the hearing, Dr. Henry L. Dee, a child psychologist, testified that Natalie had formed a parent-child bond with the Crums. He opined that the loss of Natalie’s natural mother, combined with the loss of the Crums as parental figures, could have severe long-term effects on Natalie. However, he also stated that his assumptions could be wrong and that removal to her natural father could be reasonably achieved with the child adjusting after a brief reaction and period of distress. Wilkes, his mother, father, and stepfather all testified at the hearing. Their statements were consistent with those reflected in the HRS report.
*706 The trial judge entered a final order on March 31, 1986, appointing the Crums as permanent guardians. He stated the child would be better off remaining with the Crums. Notwithstanding his ruling, the trial judge found Wilkes to be “a capable, personable young man ... from a good family....” Further, he found Wilkes to be a fit parent for custody in that he was responsible and had good character. However, the trial judge concluded that at that time Wilkes was not equipped to have custody of his daughter because his mother would be the real custodian.
Although the trial judge spoke of the “ultimate welfare of the child” according the court “a broad judicial discretion,” in reality, in rendering its decision, the trial court applied the best interest of the child standard. That standard is applied in custody disputes between parents. See § 61-18(2)(b), Fla.Stat. (1985). A different standard, however, must be applied when the custody dispute is between a parent and a third party, where the primary consideration must be the right of a natural parent to enjoy the custody, fellowship, and companionship of his offspring. In re Guardianship of D.A. McW, 460 So.2d 368 (Fla.1984); Bordley v. Blake, 478 So.2d 510 (Fla. 1st DCA 1985). As such, the natural parent of a child born out of wedlock should be denied custody only where it is demonstrated that the parent is disabled from exercising custody or that such custody will, in fact, be detrimental to the welfare of the child. In re Guardianship of D.A. McW.
The trial court found that both parties would be fit parents for custody but held, “I therefore find that the ultimate welfare of Natalie requires that her custody be granted to the Crums and that Kevin’s rights as natural father must yield to the ultimate welfare.” Since both parties were found fit for custody and Wilkes suffered from no disabilities, we think the trial court erred in not allowing the natural father to be permanent guardian of his daughter.
Accordingly, we vacate the trial judge s order appointing the Crums as guardians and remand with directions to appoint Wilkes, the natural father, as guardian. One final note: one of the problems anticipated by the trial court if custody were granted to the father was that an abrupt and complete severance of the child’s relationship with the Crums would be detrimental to the child’s welfare. We appreciate the trial judge’s concern. We would expect the natural father to consider this in making necessary adjustments concerning the relationship of his child and the Crums who assisted the child’s mother and who have devoted their time and attention to rearing Natalie.
GRIMES, A.C.J., and FRANK, J., concur.